**Not for Publication**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| PHILIP CARRINGTON, | |
| Plaintiff, | Civil Action No. 15-7030 (ES) (SCM) |
| v. | OPINION |
| CITY OF JERSEY CITY, et al., | |
| Defendants. | |

**SALAS, DISTRICT JUDGE**

Before the Court are supplemental briefs in support of Defendants City of Jersey City (the "City"); Jersey City Council (the "City Council"); Officers N. Gerand, S. Collier, Sean Mullahey, Ramon Peguero, Hennessy, Comandatore; Seargent James Crecco; Jersey City Internal Affairs Unit; Police Director James Shea, Mary McLeod Bethune Life Center ("Bethune Center") Director Alvin Pettit; and Assistant Corporate Counsel Josh Hallana's (together "Defendants") motion for summary judgment (D.E. No. 98) and *pro se* Plaintiff Philip Carrington's ("Plaintiff") cross-motion for summary judgment (D.E. No. 100). (D.E. Nos. 118–21). The Court decides this matter without oral argument. Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons that follow, the Court GRANTS Defendants' motion for summary judgment and DENIES Plaintiff's cross-motion for summary judgment.

**I.      Background**

The Court previously recounted the facts and procedural history of this matter. (*See* D.E.

No. 114 at 1–5).[1]  As a result, the Court assumes the parties' familiarity with the same and intends this memorandum to be read in conjunction with the Court's prior Opinion and Order.  (*See generally* D.E. Nos. 114 & 115).

Previously, the Court granted summary judgment in favor of Defendants as to Plaintiff's claims arising from the 2011 and 2014 Summonses.  (D.E. No. 114 at 16).  The Court also denied Plaintiff's cross-motion for summary judgment on these same claims.  (*Id.*).  Defendants had also moved for summary judgment on Plaintiff's remaining claims that Defendants had unlawfully evicted his day-care center, the Remarkable Mossi Youth Council (the "Remarkable Mossi"), from the Bethune Center because of Plaintiff's race and nationality.  (D.E. No. 98-2 at 28).  Particularly, Defendants asserted that these claims were barred by res judicata.  (*Id.*).  Because Defendants failed to fully brief all elements of the res judicata doctrine, the Court reserved its determination on the parties' motions relating to Plaintiff's claim of unlawful eviction from Bethune Center.  (D.E. No. 114 at 15–16).  The Court ordered the parties to submit supplemental briefing on the res judicata issue, as well as any other arguments relevant to the eviction claims.  (D.E. No. 115).  The parties filed supplemental briefing soon thereafter.  (*See* D.E. Nos. 118–21).

## II. Legal Standard

A court shall grant summary judgment under Federal Rule of Civil Procedure 56 "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The mere existence of an alleged disputed fact is not enough.  *Id.*  Rather, the opposing party must prove that there is a genuine issue of a material fact.  *Id*. at 248.

---

[1] All pincites to documents on the Docket refer to the CM/ECF pagination generated on the upper-right hand corner.

An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. A fact is "material" if under the governing substantive law, a dispute about the fact might affect the outcome of the lawsuit. *Id.* Factual disputes that are irrelevant or unnecessary will not preclude summary judgment. *Id.*

On a summary judgment motion, the moving party must first show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to present evidence that a genuine issue of material fact compels a trial. *Id.* at 324. To meet its burden, the nonmoving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Thus, the nonmoving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment. *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the nonmoving party. *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

**III.   Analysis**

In his supplemental briefing Plaintiff maintains that his day care business, Remarkable Mossi, was illegally evicted from the Bethune Center because of his race and nationality. (*See* D.E. No. 118 ("Pl.'s Supp. Br.") at 10; D.E. No. 121 ("Pl.'s Supp. Opp.") at 5–8). Plaintiff asserts that Defendants violated 42 U.S.C. § 1983 and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-4 ("NJLAD"). (*See* Pl.'s Supp. Br. at 10; Pl.'s Supp. Opp. at 6–8).[2]

---

[2]  Although it appears that these claims are primarily directed against defendants Pettit and Hallanan (*see, e.g.*, Pl.'s Supp. Br. at 4), Plaintiff also appears to argue that all "Defendants" violated Section 1983 and NJLAD (*see* Pl.'s Supp. Br. at 10; Pl.'s Supp. Opp. at 6–8; *see also* D.E. No. 1 ¶ 53 & 67). Thus, the Court assumes Plaintiff asserts these claims against all Defendants.

In their supplemental briefing, Defendants withdraw their res judicata defense. (*See* D.E. No. 119 ("Defs.' Supp. Br.") at 5, n.1). Instead, Defendants assert that Plaintiff's claims fail because Plaintiff cannot establish that his eviction was unlawful and because he has failed to provide any evidence that Defendants engaged in any discriminatory conduct that deprived Plaintiff of any rights. (Defs.' Supp. Br. at 5–6). As explained below, the Court agrees with Defendants.

***Unlawful Discrimination in Violation of 42 U.S.C. § 1983.*** Plaintiff asserts that Defendants violated his Fourteenth Amendment right to equal protection under the law. (Pl.'s Supp. Br. at 10). "To bring a claim under § 1983 for the denial of equal protection based on race [or national origin], a plaintiff must show: (1) he is in a protected class; (2) the defendant acted under the color of state law; and (3) the defendant treated the plaintiff differently because of his race, or, put differently, acted with a racially discriminatory intent or purpose. One way a plaintiff can prove that a state actor acted with discriminatory intent is by showing that the plaintiff 'receiv[ed] different treatment from that received by other individuals similarly situated.'" *Johnson v. Fuentes*, 704 F. App'x 61, 65 (3d Cir. 2017) (internal citations omitted); *see also Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009). "Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'" *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

Here, Plaintiff's Section 1983 claim fails because he has not provided any evidence from which a reasonable factfinder could conclude that Defendants purposefully discriminated against him because of his race or nationality. Plaintiff's primary contention is that Defendants unlawfully evicted his business because of his race and nationality. (*See* Pl.'s Supp. Br. at 4). However, the

- 4 -

record demonstrates that Defendants evicted the Remarkable Mossi because it owed rent. (See D.E. No. 108-16). The undisputed evidence shows that pursuant to City Council Resolution 05-556, dated July 13, 2005 (the "Resolution"), Remarkable Mossi was permitted to rent a room at the Bethune Center from July 1, 2003 to August 31, 2005. (*See* D.E. Nos. 98-6 & 98-13; D.E. No. 100-1 ¶¶ 19, 22–23). Under the Resolution, Remarkable Mossi's rent was set at $1,343.76 per month. (*See* D.E. No. 98-6). There is also no dispute that Plaintiff operated the Remarkable Mossi out of the Bethune Center between September 1, 2005 and January 4, 2016 (*see* D.E. No. 100-1 ¶ 18), which amounts to 124 months. Further, although the Resolution only covered the period of July 1, 2005, to August 31, 2005, it is axiomatic under New Jersey law that "when a tenant continues to occupy a premises after the termination of a lease, his status becomes that of a month-to-month holdover tenant," and that "[t]he rights and duties of such a holdover tenant are governed by the terms of the expired lease, absent a contrary agreement." *Newark Park Plaza Assocs., Ltd. v. City of Newark*, 547 A.2d 1163, 1164 (N.J. Law. Div. 1987). Thus, Remarkable Mossi was required to pay a total of approximately $166,626.24 during the period between September 1, 2005 and January 4, 2016.

Plaintiff asserts that Remarkable Mossi was up to date on its rent. (Pl.'s Supp. Br. at 11). Plaintiff provided copies of 53 checks dated between August 13, 2005 and November 17, 2015, as evidence of that he had paid the rent. (*See* D.E. No. 100-3 at 19–32). Of these checks, 36 are for $1,343.76, four are for amounts ranging between $2041.28 and $4031.28, one is for $1,350.00, one for $125.00, and the remaining 11 are for amounts ranging from $9.76 to $65.75. (*Id.*). These checks total approximately $62,055.28. Thus, even assuming Defendants actually cashed these checks—and the record contains evidence indicating that some of the checks may have been declined for insufficient funds (*see, e.g.*, D.E. No. 108-16)—Remarkable Mossi still owed

approximately $104,570.96 in back rent.

Plaintiff also contends that the Remarkable Mossi's rent was covered by federal grants from the U.S. Department of Housing and Urban Development. (Pl.'s Supp. Br. at 8–9). Particularly, he appears to assert that Remarkable Mossi received an annual Community Development Block Grant ("CDBG") of approximately $16,000, which was paid to the City. (*See id.* at 8). He contends that "Larry Bembry Director of the Grants Administration Division accept [sic] the fact that plaintiff met all the rental requirements and set plaintiff['s] rental rate at $16,121.52 annually (or $1,343.46 per month) compatible with plaintiff['s] CDBG grant from his office which would assure that the City rent will always be covered using Plaintiff['s] grant as collateral." (*Id.*). As evidence, Plaintiff provides a single letter dated July 12, 2007 and signed by Darice Toon, Director of the Division of Community Development. (*Id.* at 13).

Placing aside that this letter covers only a one-year period and says nothing about the remaining period between 2005 and 2016, the letter simply fails to support Plaintiff's contentions. First, the letter does not even reference Mr. Bembry or the alleged agreement. (*See id.*).[3] Second, although this letter is addressed to Plaintiff and it states that "your agency has been authorized to receive $16,000 in [CDBG] funds," the letter is regarding something called "Greenville Connection." (*See id.*). Plaintiff does not explain what connection, if any, Greenville Connection has with Remarkable Mossi. (*See generally* Pl.'s Supp. Br.; Pl.'s Supp. Opp.; D.E. No. 100-2). Indeed, the letter contains no reference to Remarkable Mossi or that the grant funds can be used to pay Remarkable Mossi's rent at the Bethune Center. (*See* Pl.'s Supp. Br. at 13). Third, the letter instructs Plaintiff that he must file certain documents within the specified period in order to obtain the funds, and that any request must be approved by the Division of Community

---

[3] To be sure, nothing in the record appears to even suggest that Mr. Bembry had any authority to enter into a lease on behalf of the City, let alone that Mr. Bembry had any involvement with the Bethune Center.

Development. (*Id.*). Plaintiff provides no evidence that he ever filed the required documents, that he did so within the specified period, that he requested that the funds be used to pay Remarkable Mossi's rent, or that the Division of Community Development ever approved or denied such a request. (*See generally* D.E. Nos. 100, 118 & 121). Thus, Plaintiff's bare assertions that Remarkable Mossi's rent was covered by federal grants is unsupported by the record.

Confusingly, Plaintiff also contends that the Remarkable Mossi paid the City $91,031.17 between June 2005 and December 31, 2015. (Pl.'s Supp. Br. at 4). He contends that this amount constitutes an overpayment of $73,143.67, which is owed to him. (*Id.*). But Plaintiff provides no citation to the record that would support any of these assertions, and the Court has found none.[4] At the summary judgment stage a party must provide "more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325 (1986)).

Lastly, Plaintiff suggests that a newer lease replaced the 2005 Resolution. (D.E. No. 100-2 at 13; Pl.'s Supp. Br. at 11). While Plaintiff produced a lease agreement dated June 5, 2005, under which the City allegedly leased the room to Remarkable Mossi at a monthly rate of $100 for a period of 15 years, this document is not signed by either the City or anyone authorized to act on behalf of the City. (*See* D.E. No. 100-3 at 11–16). Rather, Plaintiff testified that he filled in the blank spaces in this agreement, and that he did not have any evidence showing that the agreement was ever signed by the City or that the City accepted its terms. (*See* D.E. No. 98-16 ("Carrington

---

[4] In his supplemental opposition, Plaintiff asserts that "Defendant admits in a letter dated March 7, 2017 [that] they received $91,031.00 in rental checks from Plaintiff" and that they also received "approximately $160,000" in HUD grants meant for the Remarkable Mossi, and therefore, this "indicates [that Plaintiff's] rent was current." (Pl.'s Supp. Opp. at 7). But as far as the Court can tell, the record contains only one letter dated March 7, 2017, which was sent *by Plaintiff to Defendants* in order to amend Plaintiff's Rule 26 disclosures. (*See* Pl.'s Supp. Br. at 17). The Court is unsure just how Plaintiff can conclude that a letter he prepared is evidence that Defendants admitted to anything.

Dep.") at 71:1–6; 72:13–73:11; 74:9–20; 81:12–18; 82:5–12; 87:1–24; 88:4–23; 91:2–16; 96:1–24; *see also* D.E. No. 108-2).[5] Moreover, none of the 53 lease payment checks provided by Plaintiff demonstrate a single monthly lease payment of $100. (*See* D.E. No. 100-3 at 19–32).[6] Thus, nothing in this record supports Plaintiff's assertion that Remarkable Mossi and the City entered into a new lease agreement.

In his supplemental opposition, Plaintiff provides a list of several "undisputed" instances of alleged unequal treatment and discrimination against him. (Pl.'s Supp. Opp. at 6–8). But this alleged discriminatory activity is not supported by the record. For instance, Plaintiff first asserts that only he was forced to provide proof that Remarkable Mossi is a 501(c)(3) nonprofit organization. (*Id.* at 6). For evidence, Plaintiff states that "Discovery and Defendant Alvin Pettit Transcript pg. 122 line 19, proved the only person who was force to produce a 510C(3) [sic] was plaintiff." (*Id.*). However, Plaintiff cites to nothing in the record indicating that he was ever required to provide evidence of Remarkable Mossi's 501(c)(3) status in order to rent the room at Bethune Center. (*See id*). And further, neither the cited portion of Pettit's deposition, nor any other part of it for that matter, supports Plaintiff's assertion. (*See* D.E. No. 121-1 ("Pettit Dep.") 122:11–19 (testifying only that that he was not sure whether a specific tenant running a martial arts studio was a non-profit entity); *see also generally id*.)

Plaintiff's next asserts that he was allegedly required to have "$1.5 Million dollars of

---

[5] Plaintiff also provides another unsigned license agreement apparently dated June 27, 2005. (D.E. No. 100-3 at 7–10). This agreement states, among other things, that "Licensee shall pay the City a user fee equal to the sum of $100 or 1,343.75 per month." (*Id.* at 7). Plaintiff asserts that this agreement became the Resolution. (Pl.'s Supp. Br. at 8). But as Plaintiff himself testified, the terms of this purported agreement are different from the terms of the Resolution. (*See* Carrington Dep. 71:17–25). Further, as with the other agreement, Plaintiff testified that he had no evidence to prove that the City ever signed or approved the terms of this agreement. (*See id.* 64:6–9; 87:20–88:3; 96:19–14; *see also* D.E. No. 108-2).

[6] In his supplemental opposition, Plaintiff states that he decided "to give one check each year for approximately $1,200 to satisfy the new agreement." (Pl.'s Supp. Opp. at 8). But again, neither the checks provided by Plaintiff, nor anything else in this record, supports this assertion. (*See* D.E. No. 100-3 at 19–32).

insurance on their rental space and $1.0 Million on the play ground." (Pl.'s Supp. Opp. at 6). Plaintiff asserts that in 2013 Pettit shut down the playground because "none of the other tenants had any insurance" and that the playground was reopened after Plaintiff proved "he had 3.0 million dollars of insurance." (*Id.* at 6–7). But Plaintiff provides no citations to any evidence in the record for support, and even assuming such evidence exists, nothing in this statement indicates that Plaintiff was treated any different than the other tenants because of Plaintiff's race or nationality.

Plaintiff next argues that Defendants' brief asserts that the unsigned June 5, 2005 lease allegedly provided to Plaintiff in order to replace the Resolution "must be approved by the council as a resolution to be valid." (Pl.'s Supp. Opp. at 7). He claims that Pettit testified that no other tenant had a resolution for their lease. (*Id.* (citing Pettit Dep. at 121:22 & 122:21)). However, Plaintiff mischaracterizes Defendants' argument. Defendants *do not* argue that for the lease to be valid it had to be approved by a City Council resolution. Rather, Defendants only state that Plaintiff failed to provide any evidence that the City, or anyone authorized to act on behalf of the City, ever signed or approved the alleged lease replacing the 05-556 Resolution. (*See* Defs.' Supp. Br. at 12–13). Moreover, although Pettit testified that, like Plaintiff, other tenants do not have a current lease, Pettit repeatedly testified that the one differentiating factor between Plaintiff and the other tenants is that unlike Plaintiff, the other tenants are up to date on their rent. (*See, e.g.*, Pettit Dep. 122:7-9; 123:11-13).

Plaintiff also contends that other tenants pay less rent for similarly sized rooms. (Pl.'s Supp. Opp. at 7). But Plaintiff fails to provide any evidence that would support the inference that Defendants imposed a different rent on Plaintiff because of his race or nationality. Rather, as stated earlier, the rent amount of $1,343.76 stems from the Resolution, which was apparently reached through an agreement between Plaintiff and the City. And nothing in the record suggests

that the rent amount set by the Resolution has any connection with Plaintiff's race or nationality. In fact, Plaintiff himself argues that the amount of the rent was meant to match the amount of the CDBG grant. (*See* Pl.'s Supp. Br. at 8). Nor does Plaintiff provide any evidence that would support the inference that Defendants impose a lower rent on the other tenants because of their race or nationality.

Plaintiff next takes issue with how the January 4, 2016 eviction was conducted. (Pl.'s Supp. Opp. at 7). He alleges that "Defendant came at 1:10pm while the babies were in their cribs sleeping, with five police officers, the lock smith, Defendant Pettit and his handy man, Attorney John Hallanan, the Sheriff and a movie camera, in other words it was an embarrassing theater." (*Id.*). Plaintiff then asserts that on "October 2015 Nichole Johnson an African American according to counsel, was evicted from the Bethune Center" and that she was "told to get her children, parent and staff out of her room before the sheriff arrived." (*Id.* at 7–8). But Plaintiff again provides no citation to anything in the record to support these claims. (*See id.*). And even assuming these claims are supported by the record, Plaintiff does not explain how it shows different treatment on account of his nationality or race.[7] (*See id.*). Rather, he testified that none of the Defendants used racial slurs or made any comments about his nationality in connection with the eviction, and that he did not have any evidence that Defendants had ever engaged in acts of racism against him. (Carrington Dep. 168:20–169:1; 175:1–15).

In short, Plaintiff has provided essentially no evidence to support his discrimination claims.

---

[7] Plaintiff also contends that Defendants posted eviction notices listing other day care centers in order to humiliate and harass Plaintiff because of his race and nationality. (*See* Pl.'s Supp. Br. at 5–6; Pl.'s Supp. Opp. at 6). But as with the rest of his briefing, Plaintiff provides nothing to substantiate this assertion. (*See id.*). The record indicates that the eviction notices contained no language about Plaintiff's race or nationality. (*See* D.E. No. 100-3 at 37–38). Rather, the notices stated that Remarkable Mossi was no longer permitted to operate its business at the Bethune Center and listed other day care centers for any inconvenience associated with Remarkable Mossi's eviction. (*See id.*) Indeed, the notices expressly state that the City did not recommend or endorse any of the listed centers. (*Id.* at 38).

At most, Plaintiff provides his own subjective, unsupported belief that he suffered discrimination. But a "subjective belief of discrimination, however genuine, [cannot] be the basis of judicial relief." *See Barker v. Our Lady of Mt. Carmel Sch.*, 2016 WL 4571388, at *11 (citing *Elliott v. Group Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983). Consequently, no reasonable factfinder could conclude that Defendants violated Plaintiff's right to equal protection. Therefore, Plaintiff's Section 1983 claim fails. *See Chambers*, 587 F.3d at 197. Accordingly, the Court grants Defendants' motion for summary judgment and denies Plaintiff's cross motion.

***Violation of the NJLAD.*** NJLAD provides that it shall be unlawful "[f]or any ... public accommodation directly or indirectly . . . to discriminate against any person . . . on account of the race, creed, color, national origin, ancestry . . . or nationality of such person . . . " N.J.S.A. 10:5-12(f)(1); *see also Villari v. Township of Wall*, No. 06-0004, 2009 WL 2998135, *13 (D.N.J. Sept. 15, 2009) (citing *Ptaszynski v. Uwaneme*, 853 A.2d 288, 296 (N.J. Super. App. Div. 2004)). "Under the NJLAD a plaintiff must show that (1) defendant operates a place of public accommodation; (2) the plaintiff is a member of a protected class; and (3) he or she was denied equal treatment on the basis of his or her membership in a protected class." *Dasrath v. Cont'l Airlines, Inc.*, No. 02-2683, 2006 WL 372980, at *3 (D.N.J. Feb. 16, 2006) (citing N.J.S.A. 10:5-12(f)(1)).

Here, Plaintiff alleges that he was denied the opportunity to obtain lawful income when Defendants illegally evicted him based on his race and national origin. (Pl.'s Supp. Opp. at 8). Plaintiff's NJLAD claim fails for substantially the same reasons stated above. Particularly, on this record there is no genuine issue of material fact. As discussed above, the evidence overwhelmingly shows that Remarkable Mossi was evicted because it owed rent, not because of Plaintiff's race or nationality. Further, there is no evidence that Defendants refused to provide him with a lease or

license to occupy the Bethune Center because of his race or nationality. As with his Section 1983 claim, no reasonable factfinder could conclude that Plaintiff was denied equal treatment on the basis of his race or national origin. *See Dasrath*, 2006 WL 372980, at *3. Accordingly, the Court grants Defendants' motion and denies Plaintiff's cross-motion for summary judgment on Plaintiff's claims of unlawful eviction under the NJLAD.

## IV. Conclusion

For the foregoing reasons, the Court GRANTS Defendants' motion on Plaintiff's unlawful eviction claims, and DENIES Plaintiff's cross-motion for summary judgment on these claims. An appropriate Order accompanies this Opinion.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**